Filed 6/26/26  P. v. Reed CA6

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H052039 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C2216672) |
| v. | |
| JAYLEN TYREEZAEMOND REED, | |
| Defendant and Appellant. | |

Defendant Jaylen Tyreezaemond Reed, armed with a firearm, broke into the victim's home and, after stealing some of the victim's personal property, shot the victim in the back.  After Reed pleaded no contest to first degree robbery, assault with a firearm, and first degree burglary and admitted related firearm and great bodily injury enhancement allegations, the trial court sentenced him to 11 years in prison.  The court also issued a protective order requiring Reed to stay away from the victim.

On appeal, Reed argues that the trial court committed sentencing error.  First, Reed contends that, based on his youth and evidence of childhood trauma, he was presumptively entitled to be sentenced to the lower term rather than the middle term.  Second, the trial court improperly imposed punishment on both the robbery and burglary convictions.  Third, the trial court lacked the authority to issue a protective order at sentencing.  In supplemental briefing, Reed argues that

if trial counsel's failure to object at sentencing to issuance of the protective order amounts to a waiver of that claim, his trial counsel was constitutionally ineffective.

Following oral argument, we vacated submission and requested supplemental briefing on: (1) whether the trial court was precluded from relying on any element of Penal Code[1] section 12022.53, subdivision (d), which Reed admitted, as an aggravating circumstance, specifically whether the prohibition on the dual use of facts in California Rules of Court,[2] rule 4.420(h) prevented the trial court from relying on the aggravating circumstances in rule 4.421(a)(1) ("[t]he crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness") or rule 4.421(b)(1) ("[t]he defendant has engaged in violent conduct that indicates a serious danger to society"); (2) whether the trial court could have relied on rule 4.421(a)(8) ("[t]he manner in which the crime was carried out indicates planning, sophistication, or professionalism") as an aggravating circumstance in light of Reed's assertion at oral argument that he was manipulated by his codefendant into committing the offenses; and (3) for purposes of rule 4.421(a)(7), could the trial court have imposed consecutive terms on the robbery and burglary counts under rule 4.425?

As we explain below, we conclude that the trial court did not commit sentencing error but agree with Reed that the trial court lacked the authority to

---

[1] Unspecified statutory references are to the Penal Code.

[2] Unspecified rule references are to the California Rules of Court.

issue a stay away order at the sentencing hearing.[3]  We will strike the stay away order and affirm the judgment as modified.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural background

On December 7, 2022, the Santa Clara County District Attorney filed an indictment charging Reed and a codefendant Daejanae Yvette Grant[4] with first degree robbery in an inhabited building (§ 212.5, subd. (a); count 1), assault with a firearm (§ 245, subd. (a)(2); count 2), and first degree burglary (§ 460, subd. (a); count 3).  The indictment further alleged, as to count 1, that Reed personally and intentionally discharged a firearm (§ 12022.53, subd. (d)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)).  As to counts 2 and 3, the indictment alleged that Reed personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)).  As to count 3, the indictment further alleged that a person not an accomplice was present in the residence during the commission of the burglary (§ 667, subd. (c)(21)).[5]

At a change of plea hearing on January 26, 2024, the trial court stated that it would give a "tentative indicated" sentence of 11 years if Reed "plead[ed] to the sheet."  The district attorney opposed the indicated sentence.  Reed subsequently pleaded no contest to all counts and further admitted all the associated special enhancement allegations.

---

[3] Accordingly, we need not and do not reach Reed's alternative argument that his trial counsel was constitutionally ineffective for failing to object to issuance of that protective order.

[4] Grant is not a party to this appeal.

[5] The indictment alleged, as to all three counts, that Grant was armed with a firearm while committing the charged offenses.

At the March 15, 2024 sentencing hearing, the trial court sentenced Reed to a total term of 11 years in state prison.  The trial court selected count 3 (first degree burglary) as the principal term and imposed the middle term of four years on that count, plus a consecutive middle term of four years for the firearm enhancement (§ 12022.5, subd. (a)) and an additional three years for the great bodily injury enhancement (§ 12022.7, subd. (a)).  After finding that count 1 (first degree robbery) was not subject to section 654, the trial court imposed a concurrent middle term of seven years on that count, consisting of the middle term of four years plus a consecutive three years for the great bodily injury enhancement (§ 12022.7, subd. (a)).[6]  On count 2 (assault with a firearm), the court imposed but stayed pursuant to section 654 a total sentence of nine years, consisting of the middle term of three years for the offense, plus three years for the firearm enhancement (§ 12022.5, subd. (a)), plus an additional three years for the great bodily injury enhancement (§ 12022.7, subd. (a)).

The trial court awarded total credits of 1,051 days consisting of 917 custody credits plus 137 conduct credits under section 2933.1.  The trial court waived all fines and fees but ordered payment of $5,442.55 to the California Victim Compensation Board.

Reed timely appealed.

### B. Factual background[7]

At approximately 10:00 p.m. on August 17, 2021, San Jose Police officers responded to a report of a shooting at a residence.  The victim told officers that he was inside his apartment off Spencer Avenue in San Jose when two masked

---

[6] Pursuant to section 1385, the trial court struck the punishment for the firearm enhancement (§ 12022.53, subd. (d)) associated with count 3.

[7] Because Reed pleaded no contest, we derive the facts from the probation report and other documents in the record on appeal.

people, subsequently identified as Reed and Grant, came in the open door. Reed, armed with a handgun, told the victim to get on the floor and give "him everything he had." The victim replied that he did not have anything but told Reed to take his marijuana. Reed and Grant took the victim's marijuana, wallet, and cellphone before forcing him to open his safe. The victim said that the safe contained a watch, "a couple hundred dollars," old cellphones, and a birth certificate.

Reed then told the victim to go into his bathroom. The victim was afraid that Reed and Grant were going to kill him, so he started to fight. During the struggle, the victim was shot in the back. The victim managed to close the bathroom door, but Reed and Grant "kicked [the door] in" before fleeing.

The victim was transported to the hospital where he was treated for a gunshot wound to his upper right back (with an exit wound in his right chest) and a bullet graze to the right side of his neck.

Police recovered surveillance video from a nearby residence which showed two people exiting a white Dodge Charger at 9:16 p.m. and walking toward Spencer Avenue. At 9:34 p.m., the video showed the two suspects running back toward the vehicle and fleeing the scene. A records check revealed that the white Dodge Charger was registered to Reed and his father and that Reed and Grant, his sister, lived at the same address. Reed also was the registered owner of "a semi-automatic 9 [sic] caliber rifle." Call detail records for Reed's and Grant's cell phones indicated that those phones were in the area of the victim's address on August 17, 2021.

Reed and Grant were arrested approximately one month after the shooting. Reed initially told officers "he had never been to San Jose" but subsequently said that the victim was "talking down on [Reed's] dead family members." Reed "let

5

the words get to him" but he did not intend to kill the victim. He "blacked out during the incident" and the "shooting was a mistake."

## II. DISCUSSION

### A. No error in imposing middle term

Reed argues that the trial court abused its discretion in imposing the middle term on count 3, rather than the lower term. In Reed's view, because his youth and childhood trauma were contributing factors in the commission of the offense, the presumption in favor of a lower term sentence provided by section 1170, subdivision (b)(6) applied. We conclude that the trial court properly applied subdivision (b)(6) and did not abuse its discretion in sentencing Reed to the middle term.

#### 1. Additional background

Before sentencing, Reed filed a motion requesting that the trial court, pursuant to section 1385, dismiss the personal use of a firearm enhancement attached to his robbery conviction (count 1). In support of his request, Reed submitted: (1) a "mitigation report" prepared by Marie Danh, a licensed clinical social worker employed by the Alternate Defender's Office (Danh report); (2) a document prepared by the Center for Law, Brain & Behavior at Massachusetts General Hospital entitled, White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys and Policy Makers (January 27, 2022); (3) a letter apologizing to the victim written by Reed after he was arrested; (4) a letter Reed wrote to the trial court taking responsibility for his actions; (5) letters of support from the pastor and other members of Reed's church; (6) copies of social media posts by Reed's mother; (7) a letter from the Jericho Project Drug and Alcohol Treatment Program intake director advising that Reed was a suitable candidate for

6

treatment; and (8) a letter and certificate of completion from the Roadmap to Recovery Program.[8]

In the Danh report, the social worker described how Reed's mother reported that when Reed was eight years old, she walked in on Grant, Reed's ten-year-old sister, molesting him. Reed reported that Grant started molesting him when he was "around seven years old" and it had happened "at least five times" before his mother found out. Reed's mother said they went to therapy thereafter and Grant was told to never go into the "boys [*sic*] room at any time." Reed "denie[d] any effects[]" from the molestation but "admits that he thinks about it when [he and Grant] are together."

The Danh report also noted that Reed "has severe Tourette's Syndrome" and was bullied at school, leading to his expulsion when he fought back. Reed's mother began to homeschool him, which the social worker indicated deprived him of "a peer group and activities that would encourage independence and healthy adulthood behaviors in the future."

According to the Danh report, Reed moved out of his family home in April 2021 because he " 'no longer wanted to follow [his parents'] rules[.]' " Reed would sleep in his car, on his aunt's couch, or on his "half-brother's grandmother's couch." Reed's half-brother, who was older, introduced Reed to marijuana and Reed soon was smoking marijuana and drinking alcohol regularly.

The Danh report indicated that Reed legally obtained a firearm after threats against him and his family were posted on social media following a failed romantic relationship. Reed also began to rely more on Grant as a source of

_____

[8] At the outset of the sentencing hearing, the trial court stated that it reviewed all these materials as well as the probation report.

7

support given their "common goal of desired independence … from their family while wanting to improve their current situations."

The Danh report noted that Reed had no criminal history and that "[h]is behaviors and actions surrounding this first and only pending matter [were] undoubtedly impulsive, irresponsible, and risky." The report concluded that Reed's "misplaced sense of maturity upon turning 18 and moving out on a whim significantly contributed to his reliance on individuals whom he did not have a healthy or close relationship with regardless of title."

The probation report recommended that Reed be sentenced to 11 years in state prison. The report acknowledged that Reed "is youthful and has no criminal history," but "the level of violence he demonstrated in the present offense is disconcerting as he presents a serious safety concern to the community."

At the sentencing hearing, defense counsel asked the trial court to take Reed's age, his biographical and social background, and the circumstances of the incident into account. Defense counsel argued that Reed was "manipulated" by Grant into committing the offenses, as she told him "she was raped by the victim and in that fashion motivated [Reed]'s anger and emotion to protect her and seek revenge on the victim." Defense counsel also raised Grant's childhood molestation of Reed, stating that she could not "begin to … unwind what impact that may have on" Reed. In conclusion, defense counsel argued that, based on changes to section 1170, the trial court must consider Reed's youth and childhood trauma in not only dismissing the firearm enhancement under section 1385 but also "depart[ing] downward" from the indicated sentence of 11 years.

The prosecutor read the victim's impact statement into the record. Based on the circumstances of the offenses, the prosecution argued that the trial court

8

should reconsider its indicated sentence of 11 years and impose a longer sentence instead.

Before pronouncing sentence, the trial court acknowledged Reed's youth, as well as his lack of a criminal record, but also pointed out how frightening the crime was for the victim. The trial court thereafter imposed the indicated sentence of 11 years but exercised its discretion under section 1385 to dismiss the 25 years to life firearm punishment (§ 12022.53, subd. (d)). The court explained that it did so "based on [Reed]'s age, his lack of criminality, his expression of remorse[,] … the fact that he took responsibility[,] and he has been doing a lot of programming while in custody."

### 2. Applicable legal principles

We review the trial court's sentencing decisions for an abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) Under this standard of review, the "trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted.)

To prove an abuse of discretion, " ' " '[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.]' " ' " (*People v. Fredrickson* (2023) 90 Cal.App.5th 984, 988 (*Fredrickson*); see also *People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*) [a sentencing court "does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it"].) " ' " 'In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a

9

particular sentence will not be set aside on review.  [Citation.]' " ' "  (*Fredrickson*, at p. 988.)

Section 1170, subdivision (b)(1) directs trial courts to impose no more than the middle term of a sentencing triad unless certain circumstances exist.[9]  Section 1170, subdivision (b)(6) provides: "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:  [¶]  (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.  (B) The person is a youth or was a youth as defined under subdivision (b) of Section 1016.7 at the time of commission of the offense."[10]  (§ 1170, subd. (b)(6).)

Under the plain language of section 1170, subdivision (b)(6), subject to a balancing of aggravating and mitigating circumstances and consideration of their impact on the interests of justice, the sentencing court shall impose the lower term if it finds that the defendant's youth or their experience of "psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence" were contributing factors in the defendant's commission of the charged offense.  Section 1170(b)(6) "does not mandate a presumption in favor of the lower term in every case in which the defendant" generally falls under one of the categories enumerated in the subdivision.

---

[9] "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph 2."  (§ 1170, subd. (b)(1).)

[10] Section 1016.7, subdivision (b) defines "youth" as "any person under 26 years of age on the date the offense was committed."  (§ 1016.7, subd. (b).)

(*Fredrickson*, *supra*, 90 Cal.App.5th at p. 991.)  Rather, "[t]he statute is clear that [childhood trauma] (or one of the other two categories in subdivision (b)(6)) *must be a contributing factor to the offense* in order to qualify for a presumption [of the] low term" in sentencing.  (*People v. Hilburn* (2023) 93 Cal.App.5th 189, 204, fn. 6, italics added; *id.* at p. 205; *Fredrickson*, *supra*, at p. 991.)

### 3. Analysis

We are not persuaded by Reed's contention that section 1170, subdivision (b)(6)'s lower term presumption was triggered in this case.  The record does not support a conclusion that Reed presented evidence to show that his youth and childhood trauma were contributing factors in the commission of the offenses.  (*Fredrickson*, *supra*, 90 Cal.App.5th at p. 994.)

The Danh report described Reed's family history of childhood sexual abuse at the hands of his older sister, Grant, as well as his Tourette's Syndrome diagnosis.  The Danh report also indicated that, based on this history, Reed was susceptible to negative influences and prone to making poor decisions.  At the sentencing hearing, defense counsel argued that Grant "manipulated" Reed into committing the offenses by telling him that the victim had "raped" her.

Even assuming there was sufficient evidence to trigger the lower term presumption of section 1170.6, Reed has not met his burden of showing that the trial court abused its discretion in imposing middle term on count 3.  In his briefing, Reed asserts that, because "the record does not affirmatively show that the trial court complied with [section 1170, subdivision (b)(6)] after the initial showing of [its] applicability," the trial court did not exercise its " 'informed discretion' " under the statute.  We disagree.

In *People v. Caparrotta* (2024) 103 Cal.App.5th 874, the defendant argued the trial court erred at sentencing because it failed to discuss or even reference the

11

lower term presumption under section 1170, subdivision (b)(6). (*Caparrotta*, at p. 905.) On appeal, the court concluded this claim was meritless because "nothing in the record establishes that the trial court was unaware of its obligations under … section 1170, subdivision (b)(6) or that it failed to apply that provision. 'In the absence of evidence to the contrary, we presume that the court "knows and applies the correct statutory and case law." ' [Citation.] Thus, although the trial court did not specifically mention … section 1170, subdivision (b)(6), it is presumed to have known of the provision. Moreover, because Caparrotta highlighted … section 1170, subdivision (b)(6) in his sentencing memorandum, we presume that the trial court was aware Caparrotta was seeking to benefit from that provision." (*Caparrotta*, at p. 905.) In so holding, *Caparrotta* rejected the argument that "the trial court must expressly state, using the statutory language, that as a result of weighing the applicable factors, it has concluded that 'imposition of the lower term would be contrary to the interests of justice.' " (*Id.* at p. 906, fn. 14.)

We reach the same result here. The record indicates the trial court had reviewed Reed's sentencing brief, including the documents attached thereto, along with the probation report. Reed's counsel expressly stated at the sentencing hearing that the court was to consider Reed's youth and "trauma" pursuant to section 1170 and there was "support for the court to depart downward from the 11 years [indicated sentence]."

Further, while the court only mentioned Reed's youth and lack of a criminal record before pronouncing sentence, Reed's childhood trauma was discussed by defense counsel and prominently featured in the materials the court reviewed. Although the trial court did not explicitly say so, we infer that the trial court properly understood its discretion and found the aggravating circumstances of the offenses outweighed the mitigating circumstances such that imposing the

12

lower term would not be in the interests of justice.  (See *People v. Ramirez* (2021) 10 Cal.5th 983 ["Absent evidence to the contrary, we presume that the trial court knew the law and followed it"]; *Fredrickson, supra*, 90 Cal.App.5th at p. 988 [" ' " 'In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.  [Citation.]' " ' "].)

On this record, we cannot say that the court failed to consider section 1170, subdivision (b)(6), or that its decision to impose the middle term notwithstanding the provision was "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony, supra*, 33 Cal.4th at p. 377.)

### B. Dual use of facts (rule 4.420(h)) from personal discharge of a firearm enhancement

In his supplemental briefing, Reed concedes the trial court could have relied on the facts supporting the enhancement for personal discharge of a firearm (§ 12022.53, subd. (d)) as aggravating factors.  However, in Reed's view, the trial court's "vague statement" that the offenses were "very scary for the victim" was not sufficient to imply a finding that "[t]he crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness" (rule 4.421(a)(l)) or that Reed "has engaged in violent conduct that indicates a serious danger to society" (rule 4.421(b)(l)).  Thus, Reed argues, the trial court did not sufficiently "set forth on the record the facts and reasons for choosing the sentence imposed" as required by section 1170, subdivision (b)(5).

Reed also contends that all robberies are necessarily "scary" for the victims and that there were no facts that made this particular robbery worse than any other. Reed also argues that, because the firearm was discharged as he struggled with the victim, the shooting does not reflect a "high degree of cruelty, viciousness or

13

callousness" (rule 4.421(a)(l)) or that he presents a "serious danger to society" (rule 4.421(b)(l)).

The Attorney General argues first that there is no prohibition against the dual use of facts where the trial court is deciding between the low term and the middle term. In the alternative, the Attorney General contends that the trial court could consider the facts relating to Reed's intentional discharge of a firearm since Reed admitted that enhancement and the trial court struck the punishment for it.

Rule 4.420(h) provides that "[a] fact that is an element of the crime on which punishment is being imposed may not be used to impose a particular term." However, rule 4.420(g) provides that "a fact charged and found as an enhancement may be used as a reason for imposing a particular term only if the court has discretion to strike the punishment for the enhancement and does so."

We need not decide whether rule 4.420(h)'s prohibition on the dual use of facts to impose an aggravated sentence applies to the trial court's decision to impose a low or middle term sentence. The parties agree that, because the trial court had the discretion to strike the punishment for the personal discharge of a firearm (§ 12022.53, subd. (d)) enhancement and did so, the trial court could rely on the facts supporting that enhancement in its sentencing decision (rule 4.420(g)). We need only decide whether the facts supporting the enhancement also support the trial court's decision to impose the middle term instead of the lower. It is clear they do.

Reed and his sister, wearing masks, entered the victim's apartment at night. Reed was carrying a handgun and forced the victim to the ground before robbing him. Reed and his sister then forced the victim to go into his bathroom, which the victim believed meant they intended to kill him. As the victim fought to escape, Reed shot him in the back. After the victim managed to close the bathroom door,

14

Reed and his sister kicked in the door before finally fleeing the apartment. These facts amply support the aggravating factors set forth in rule 4.421(a)(1) ("[t]he crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness") and rule 4.421(b)(1) ("[t]he defendant has engaged in violent conduct that indicates a serious danger to society"). Accordingly, the trial court reasonably concluded that imposing the lower term would not be in the interests of justice.

### C. The offenses showed "planning, sophistication, or professionalism"

Reed argues that the trial court could not have relied on the aggravating circumstance set forth in rule 4.421(a)(8), i.e., "[t]he manner in which the crime was carried out indicates planning, sophistication, or professionalism" for two reasons. First, he asserts that the circumstances of the burglary and robbery "were not distinctively worse than an 'ordinary' burglary and robbery" and therefore could not be considered "aggravated." Second, he claims that the planning of the crime could *only* be attributed to his sister, not himself, since she was the one who convinced Reed to rob the victim.

We disagree. To Reed's first point, the trial court could reasonably conclude that the facts of this burglary and robbery were worse than an "ordinary" burglary and robbery. Here, the victim was confronted with masked, armed intruders who entered his apartment at night. During the robbery, Reed forced the victim into the bathroom and, as the victim fought back in fear for his life, shot the victim in the back.

Next, assuming the trial court believed Reed's claim that his sister told him that the victim had raped her and that he simply went along with his sister's plan to rob the victim as retaliation, the trial court could still reasonably have concluded that Reed actively participated in planning and carrying out the offenses.

15

***D. No error in not staying term on count 1 under section 654***

Reed contends the trial court erred under section 654 in finding separate intents for the burglary (count 3) and for the robbery (count 1). In his view, the trial court should have only imposed punishment for one of these offenses and stayed punishment on both remaining counts. The Attorney General counters that substantial evidence supports the trial court's express finding that section 654 did not bar the imposition of separate punishments because Reed had "a different intent" in committing the robbery and the burglary.

In his supplemental brief, Reed argues that the trial court's imposition of concurrent terms for robbery and burglary do not support imposing consecutive terms under rule 4.425 because both the objective of the offense (rule 4.421(a)(1)) and the violence employed to effectuate the objective (rule 4.421(a)(2)) were the same: to take the victim's property. We are not persuaded.

***1. Applicable legal principles***

Section 654, subdivision (a) states in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." "The statutory purpose underlying section 654 'is to ensure that a defendant's punishment will be commensurate with his [or her] culpability.' [Citation.] To that end, the statute prohibits courts from imposing multiple punishment for the same act or omission … ." (*People v. Kelly* (2018) 28 Cal.App.5th 886, 904.) "If a single action or course of conduct by a defendant violates multiple laws, 'the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, [but] the trial court may impose sentence for only one offense … .' [Citation.]" (*People v. Sek* (2022) 74 Cal.App.5th 657, 673.) "Whether a course of criminal conduct is divisible and

16

therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.]  Its findings will not be reversed on appeal if there is any substantial evidence to support them." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones*).)  "The court's findings may be either express or implied from the court's ruling.  [Citation.]  In the absence of any reference to ... section 654 during sentencing, the fact that the court did not stay the sentence on any count is generally deemed to reflect an implicit determination that each crime had a separate objective." (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626.)  The implied finding "must be sustained on appeal if supported by substantial evidence." (*People v. Osband* (1996) 13 Cal.4th 622, 730.)  In applying this standard, we "review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*Jones, supra*, at p. 1143.)

Under rule 4.421(a)(7), a trial court may consider as an aggravating circumstance that "[t]he defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed."  Rule 4.425 sets forth the "[f]actors affecting the decision to impose consecutive rather than concurrent sentences," including, as relevant to this case, whether the "crimes and their objectives were predominantly

17

independent of each other" (rule 4.425(a)(1)) and whether they "involved separate acts of violence or threats of violence" (rule 4.425(a)(2)).

### 2. Analysis

In this case, the record shows that the trial court considered section 654 in its sentencing choice, determining that section 654 applied to Reed's conviction for assault with a firearm (count 2) as Reed's intent was the same for the burglary (count 3), but expressly stating that it did *not* apply to robbery (count 1) since Reed's intent to rob the victim was different from his intent to commit burglary.

Reed claims that section 654 applies because "the 'sole purpose' of the burglary was to effectuate the robbery." However, we need not credit Reed's explanation regarding his intent but instead look to whether there is substantial evidence to support the trial court's finding. We "review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*Jones, supra*, 103 Cal.App.4th at p. 1143.)

In count 1, Reed was convicted of first degree robbery[11] which requires that he have the "specific intent to deprive the victim of the property permanently. [Citations.]" (*People v. Anderson* (2011) 51 Cal.4th 989, 994.) Further, the property must be taken from the victim's "person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) In count 3, Reed was convicted of first degree burglary, which is defined as entering an "inhabited dwelling house" (§ 460) "with the intent to commit … larceny or any felony."

---

[11] A robbery "perpetrated in an inhabited dwelling house" is first degree robbery. (§ 212.5, subd. (a).)

18

As Reed argued at sentencing, he entered the victim's apartment not to rob him, but rather because Grant had told him that the victim had raped her. In this account, Reed was angry at the victim for raping his sister and wanted to take revenge on him. According to the probation report, Reed made no mention of wanting to take the victim's property but instead told police that the victim "was talking down on [Reed's] dead family members, he wasn't thinking, let the words get to him, and did not intend to shoot the victim."

Consequently, there is substantial evidence to support the trial court's finding that Reed had separate intents for both the burglary and the robbery. Based on the record, the trial court could have reasonably concluded that Reed entered the victim's apartment with the intent to assault him (because Grant told him the victim had raped her) and only later formed the intent to take the victim's property. Viewing the trial court's ruling "in the light most favorable to the respondent and presum[ing] the existence of every fact the trial court could reasonably deduce from the evidence" (*Jones, supra*, 103 Cal.App.4th at p. 1143), the trial court did not abuse its discretion in concluding that section 654 did not apply to Reed's conviction on count 1.

Here, the trial court elected to impose concurrent sentences for the first degree robbery (count 1) and first degree burglary (count 3) convictions, although it found, for purposes of section 654, that those offenses had independent objectives (rule 4.425(a)(1)). Based on the circumstances of this case, the trial court could have found in its discretion that consecutive terms for the robbery and burglary counts were warranted. The decision to impose concurrent terms means the court could have relied on rule 4.421(a)(7) as an additional aggravating circumstance justifying imposition of the middle term.

19

### C. Protective order

Reed argues that the trial court exceeded its authority by issuing a ten-year stay away order at his sentencing hearing. The Attorney General argues that the order was a valid exercise of the trial court's inherent judicial authority. We agree with Reed that the trial court lacked the authority to issue a postjudgment restraining order and will strike that order.

#### 1. Additional background

At the sentencing hearing, the prosecutor asked that the trial court impose "a 10-year criminal protective order for the victim." The trial court responded that, unless Reed stipulated to such an order, it did not "believe … [it] has authority to issue a protective order at sentencing in this case." The prosecutor acknowledged that Reed would not likely stipulate to a protective order but asked for the order "in an abundance of caution." After pronouncing sentence, the trial court ordered that Reed "stay away" from the victim "while [Reed]'s on parole" though it expressed some uncertainty as to whether this was "an enforceable order."

#### 2. Applicable legal principles

It is well settled that, under "section 136.2 … [when the court has] 'a good cause belief that harm to, or intimidation or dissuasion of, a victim or witness has occurred or is reasonably likely to occur,' the court is authorized to issue a restraining order.' Orders made under [section 136.2] are 'operative only during the pendency of criminal proceedings and as prejudgment orders.' " (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324–1325.) The only purpose of a section 136.2 protective order is to " 'protect victims and witnesses in connection with the criminal proceeding in which the restraining order is issued in order to allow

20

participation without fear of reprisal.' " (*People v. Ponce* (2009) 173 Cal.App.4th 378, 383 (*Ponce*).)

We also observe that courts must, at the time of sentencing for certain crimes, consider issuing a protective order prohibiting a defendant from contacting a victim. (See, e.g., §§ 136.2, subd. (i)(1),[12] 273.5,[13] 646.9, subd. (k).)[14] None of these other statutes are applicable in this matter.

---

[12] Section 136.2, subdivision (i)(1) requires a trial court, at the time of sentencing a defendant convicted of domestic violence or other specified crimes, to consider issuing an order restraining the defendant from any contact with the victim for a period of up to 10 years. Subdivision (i)(1) of section 136.2 states: "It is the intent of the Legislature in enacting this subdivision that the duration of a restraining order issued by the court be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of a victim and [his or her] immediate family. …"

[13] Section 273.5, subdivision (j), provides: "Upon conviction under subdivision (a) [willful infliction of corporal injury], the sentencing court shall also consider issuing an order restraining the defendant from contact with the victim, which may be valid for up to 15 years, as determined by the court. It is the intent of the Legislature that the length of a restraining order be based upon the seriousness of the facts before the court, the probability of future violations, the safety of the victim and their immediate family, and the information provided to the court pursuant to Section 273.75. This protective order may be issued by the court whether the defendant is sentenced to state prison or county jail, or if imposition of sentence is suspended and the defendant is placed on probation."

[14] Section 646.9, subdivision (k), provides: "(1) The sentencing court also shall consider issuing an order restraining the defendant [convicted of stalking] from any contact with the victim, that may be valid for up to 10 years, as determined by the court. It is the intent of the Legislature that the length of any restraining order be based upon the seriousness of the facts before the court, the probability of future violations, the safety of the victim and their immediate family, and the information provided to the court pursuant to Section 273.75. [¶] (2) This protective order may be issued by the court whether the defendant is sentenced to state prison, county jail, or if imposition of sentence is suspended and the defendant is placed on probation."

21

### 3. Analysis

The Attorney General concedes that the trial court lacked any statutory authority to issue the protective order in question. We agree. Section 136.2 provides that a trial court may issue a protective order during the pendency of a criminal trial, but not after conviction for the crimes of which Reed was convicted. (*Ponce, supra*, 173 Cal.App.4th at pp. 382–383.)

Instead, the Attorney General relies on *Townsel v. Superior Court* (1999) 20 Cal.4th 1084 (*Townsel*) for the proposition that trial courts have "inherent authority upon a showing of good cause to issue appropriate protective orders for a defendant not to contact a victim or a victim's family," "independent of statute." We are not persuaded.

In *Townsel*, the petitioner, who had been sentenced to death and whose automatic appeal was pending before the California Supreme Court, sought "relief from an order of respondent superior court, entered sua sponte, prohibiting his appellate counsel from contacting trial jurors without first obtaining that court's approval." (*Townsel, supra*, 20 Cal.4th at pp. 1086–1087.) The challenged order was issued many years after the jury's verdict, and it "arose out of proceedings to correct and augment the record in petitioner's automatic appeal." (*Id.* at p. 1088.)

The California Supreme Court confirmed in *Townsel* that, despite statutes enacted or amended "to protect the safety and privacy of jurors," "trial courts retain inherent power to protect both juror safety and juror privacy." (*Townsel, supra*, 20 Cal.4th at p. 1091.) The Supreme Court concluded that the trial court "possessed the inherent judicial power to limit the parties' ability to contact jurors following completion of the trial" (*id.* at p. 1094, fn. omitted) and that the trial court had acted within its discretion in issuing the no-contact order. (*Id.* at p. 1096.) It stated: "[T]his was a capital trial, and defendant was found guilty and

22

sentenced to suffer the death penalty. Further, it appears that defendant was convicted of murdering one victim because she was a witness to a previous crime (Pen. Code, § 190.2, subd. (a)(10) [witness-killing special circumstance]), and that he was also convicted of attempting to prevent or dissuade a witness. Each of these circumstances raises serious concerns about juror safety." (*Id.* at p. 1097, fn. omitted.) The court concluded that the trial court "did not abuse its discretion by acting as a neutral intermediary to ensure any posttrial juror contact was consensual and reasonable." (*Id.* at p. 1098.) *Townsel* makes no mention of section 136.2 or a trial court's inherent authority to issue nonstatutory "stay away" orders for crime victims.

In *Ponce*, a protective order was issued for the victim after the defendant pleaded no contest to second degree robbery with a street gang enhancement and was sentenced to state prison. The trial court based the protective order on section 136.2. (*Ponce, supra*, 173 Cal.App.4th at p. 380.) The *Ponce* court determined that no statutory basis existed for the protective order. (*Id.* at pp. 382–383.) Moreover, the appellate court rejected the government's argument that, even if the trial court had acted under its inherent authority, the protective order was authorized. (*Id.* at pp. 383–384.) *Ponce* held that, even if a trial court has inherent authority over an area where the Legislature has not acted, that does not permit orders to be issued "by fiat" or without a valid showing justifying its need. (*Id.* at p. 384.)

The appellate court further found that, in any event, "there was no evidence that after being charged Ponce had threatened, or had tried to dissuade, any witness, or had tried to unlawfully interfere with the criminal proceedings." (*Ponce, supra*, 173 Cal.App.4th at p. 384.) The prosecutor in *Ponce* "did not make an offer of proof or any argument to justify the need for a protective order."

23

(*Ibid.*) A "prosecutor's wish to have such an order, without more, is not an adequate showing sufficient to justify the trial court's action." (*Id.* at pp. 384–385.)

The *Ponce* court allowed that, in unique and compelling circumstances, such as where the defendant threatened witnesses after having been charged, a court may be justified in exercising its inherent power to issue a protective order. (*Ponce, supra*, 173 Cal.App.4th at pp. 384–385.) The appellate court, however, concluded that inherent powers should not be exercised in a way that nullifies existing legislation. "Where the Legislature authorizes a specific variety of available procedures, the courts should use them and should normally refrain from exercising their inherent powers to invent alternatives." (*Id.* at p. 384.)

The Attorney General seeks to distinguish *Ponce* which rejected the conclusion that a court can issue a postjudgment protective order under section 136.2 based on its inherent authority and due to the "extremely dangerous crimes of armed robbery, home invasion burglary, and assault with a firearm."

Even if we were to assume the trial court's inherent authority applied beyond the circumstances addressed in *Townsel*, which involved protection of jurors after trial, issuance of a protective or "stay away" order was improper here. Similar to the circumstances in *Ponce*, there was no offer of proof by the prosecutor that Reed continued to threaten the victim or had sought to intimidate him from testifying in this case. (*Ponce*, *supra*, 173 Cal.App.4th at p. 384–385.) The issuance of a protective order without a proper showing by the prosecutor is not lawfully authorized. (*Id*. at pp. 384–385.) We are not aware of nor has the Attorney General provided any legal authority which would indicate otherwise.

Here, the violent nature of Reed's crime is undisputed, and we do not intend to minimize the harm caused to the victim. However, an insufficient

24

showing was made establishing the authority for a nonstatutory protective order which can extend beyond the imposition of this judgment. The order issued against Reed therefore "transcended the authorization of section 136.2" and must be vacated. (*People v. Stone* (2004) 123 Cal.App.4th 153, 160.) Because we strike the protective order in its entirety, we need not reach Reed's alternative argument he received ineffective assistance of counsel.

### III.    DISPOSITION

The judgment is modified to strike the stay away order. As modified, the judgment is affirmed. The trial court shall forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

_____
                                        WILSON, J.


WE CONCUR:




_____
GROVER, ACTING P. J.




_____
LIE, J.




*The People v. Reed*
H052039